UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | |
|---|---|
| CHERYL L. DUGAN, | ) |
| Plaintiff, | ) |
| v. | ) CAUSE NO. 1:20-cv-00344-SLC |
| COMMISSIONER OF SOCIAL SECURITY, *sued as Kilolo Kijakazi, Commissioner of Social Security,*[1] | ) |
| Defendant. | ) |

## OPINION AND ORDER

Plaintiff Cheryl L. Dugan appeals to the district court from a final decision of the Commissioner of Social Security ("Commissioner") denying her application under the Social Security Act (the "Act") for Supplemental Security Income ("SSI"). (ECF 1). For the following reasons, the Commissioner's decision will be AFFIRMED.

## I.  FACTUAL AND PROCEDURAL HISTORY

Dugan applied for SSI in July 2017, alleging disability as of May 2017.[2] (ECF 18 Administrative Record ("AR") 15, 192-94). Dugan's claim was denied initially and upon reconsideration. (AR 122-31). On August 19, 2019, administrative law judge Genevieve Adamo ("the ALJ") conducted an administrative hearing at which Dugan, who was represented by counsel, and a vocational expert ("VE") testified. (AR 33-68). On December 2, 2019, the ALJ rendered an unfavorable decision to Dugan, concluding that she was not disabled because

---

[1] Kilolo Kijakazi is now the Acting Commissioner of Social Security, *see, e.g.*, *Butler v. Kijakazi*, 4 F.4th 498 (7th Cir. 2021), and thus, she is automatically substituted for Andrew Saul in this case, *see* Fed. R. Civ. P. 25(d).

[2] Regardless of a claimant's claimed onset date, SSI is not payable until the month following the month in which a claimant files her SSI application. *See* 20 C.F.R. § 416.335. Therefore, the first month Dugan could be eligible to receive SSI is August 2017, given that she applied for SSI in July 2017.

she could perform a significant number of unskilled, light-exertional jobs in the national economy despite the limitations caused by her impairments. (AR 15-26). The Appeals Council denied Dugan's request for review (AR 1-6), at which point the ALJ's decision became the final decision of the Commissioner. *See* 20 C.F.R. § 416.1481.

Dugan filed a complaint with this Court on October 1, 2020, seeking relief from the Commissioner's decision. (ECF 1). In her appeal, Dugan contends that the ALJ's step-five finding is not supported by substantial evidence because she failed to identify a significant number of jobs that Dugan could perform despite her impairments, and because the VE's testimony (upon which the ALJ relied) used unreliable methodology in arriving at the number of jobs. (ECF 24 at 7).

At the time of the ALJ's decision, Dugan was forty-eight years old (AR 192), had a high school education (AR 20, 40), and had past relevant work as a cashier (AR 24). In her application, Dugan alleged disability due to the following medical conditions: "medically frail," "bipolar," fibromyalgia, depression, anxiety, sciatica, pinched nerves, a back injury, "feelings of being overwhelmed and very sen[si]tive to noises," and obsessive compulsive disorder. (AR 215).

## II. STANDARD OF REVIEW

Section 405(g) of the Act grants this Court the "power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). The Court's task is limited to determining whether the ALJ's factual findings are supported by substantial evidence, which means "such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (citation omitted). The decision will be reversed only if it is not supported by substantial evidence or if the ALJ applied an erroneous legal standard. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000) (citation omitted).

To determine if substantial evidence exists, the Court reviews the entire administrative record but does not reweigh the evidence, resolve conflicts, decide questions of credibility, or substitute its judgment for the Commissioner's. *Id.* Rather, if the findings of the Commissioner are supported by substantial evidence, they are conclusive. *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003) (citation omitted). "In other words, so long as, in light of all the evidence, reasonable minds could differ concerning whether [the claimant] is disabled, we must affirm the ALJ's decision denying benefits." *Books v. Chater*, 91 F.3d 972, 978 (7th Cir. 1996).

### III.  ANALYSIS

#### *A.  The Law*

Under the Act, a claimant seeking SSI must establish that she "is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A). A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 1382c(a)(3)(D).

The Commissioner evaluates disability claims pursuant to a five-step evaluation process, requiring consideration of the following issues, in sequence: (1) whether the claimant is

currently unemployed in substantial gainful activity; (2) whether she has a severe impairment; (3) whether her impairment or combination of impairments meets or equals one of the impairments listed by the Commissioner, *see* 20 C.F.R. Part 404, Subpart P, App'x 1; (4) whether she is incapable of performing her past relevant work; and (5) whether she is incapable of performing work in the national economy.[3] *See Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001) (citations omitted); 20 C.F.R. § 416.920. An affirmative answer leads either to the next step or, on steps three and five, to a finding that the claimant is disabled. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001) (citation omitted). A negative answer at any point other than step three stops the inquiry and leads to a finding that the claimant is not disabled. *Id.* (citation omitted). The burden of proof lies with the claimant at every step except the fifth, where it shifts to the Commissioner. *Clifford*, 227 F.3d at 868 (citation omitted).

## B. The Commissioner's Final Decision

On December 2, 2019, the ALJ issued a decision that ultimately became the Commissioner's final decision. (AR 15-26). At step one, the ALJ concluded that Dugan had not engaged in substantial gainful activity after her application date of July 31, 2017. (AR 17). At step two, the ALJ found that Dugan had the following severe impairments: obesity, diabetes mellitus, fibromyalgia, carpal tunnel syndrome, repression, and anxiety. (*Id.*). At step three, the ALJ concluded that Dugan did not have an impairment or combination of impairments severe enough to meet or equal a listing. (AR 18).

Before proceeding to step four, the ALJ determined that Dugan's symptom testimony was

---

[3] Before performing steps four and five, the ALJ must determine the claimant's RFC or what tasks the claimant can do despite her limitations. 20 C.F.R §§ 416.920(e), 416.945(a). The RFC is then used during steps four and five to help determine what, if any, employment the claimant is capable of. 20 C.F.R. § 416.920(e).

4

not entirely consistent with the medical evidence and other evidence of record. (AR 21). The ALJ assigned Dugan the following RFC:

> [T]he claimant has the [RFC] to perform light work as defined in 20 CFR 416.967(b) except she is capable of occasionally climbing ladders, ropes, or scaffolds; frequently climbing ramps and stairs, balancing, stooping, kneeling, crouching, and crawling. She must avoid concentrated exposure to vibration. She must avoid unprotected heights. She must avoid concentrated exposure to slippery, wet and uneven surfaces. She can perform frequent handling and fingering. She can perform simple, routine, and repetitive tasks with no production rate pace like assembly line work with only occasional simple work-related decision making. She can maintain attention and concentration for two-hour segments. She could respond appropriately to predictable changes in the workplace. She could have frequent interactions with supervisors apart from what is necessary for general instruction, task completion, or training; and could have frequent interactions with coworkers and the general public.

(AR 19-20).

The ALJ found at step four that given the foregoing RFC, Dugan could not perform her past relevant work. (AR 24). However, at step five, the ALJ concluded that given Dugan's RFC, age, education, and work experience, she could perform a significant number of unskilled, light-exertional jobs in the national economy, including sorter, routing clerk, and collator machine operator. (AR 25). Accordingly, Dugan's application for SSI was denied. (AR 26).

### C. The ALJ's Step-Five Determination

In her sole argument on appeal, Dugan challenges the ALJ's step-five determination. As already explained, a plaintiff seeking SSI bears the burden of proof at steps one through four of the ALJ's sequential five-part inquiry; the burden then shifts to the Commissioner at step five. *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 352 (7th Cir. 2005). At this final step, the Commissioner must establish that the plaintiff's RFC allows her to engage in work found in "significant numbers" in the national economy. *Liskowitz v. Astrue*, 559 F.3d 736, 742-43 (7th

5

Cir. 2009); *see* 20 C.F.R. § 416.966. One way the Commissioner may carry her step-five burden is through the use of VE testimony, provided that such testimony is reliable. See *Liskowitz*, 559 F.3d at 743; *Ehrhart v. Sec'y of Health & Human Servs.*, 969 F.2d 534, 540 (7th Cir. 1992).

Dugan advances two arguments in challenging the ALJ's step-five determination. She first argues that the ALJ failed to carry her burden to identify a significant number of jobs in the national economy that she is capable of performing despite the limitations caused by her impairments. (ECF 24 at 11-14). Dugan also contends that the VE's testimony about the number of jobs (upon which the ALJ relied) was not substantial evidence to support the ALJ's step-five determination because the VE used unreliable methodology. (*Id.* at 14-17). The Court will discuss each of these arguments in turn.

1. Number of Jobs in the National Economy

The ALJ concluded at step five that Dugan was not disabled based on the VE's testimony that a hypothetical individual of Dugan's age, education, work experience, and RFC could still perform a significant number of jobs in the national economy. (AR 25-26). Specifically, the VE testified that such individual could perform the following representative jobs: sorter, 45,000 jobs nationally; routing clerk, 33,000 jobs nationally; and collator machine operator, 21,000 jobs nationally. (AR 62; *see also* AR 25). Dugan contends that the ALJ failed to carry her step-five burden because the total number of representative jobs cited by the VE—99,000 jobs nationally—accounts for just .064% of the 153,250,000 total jobs in the national economy. (ECF 24 at 11-12 (citing *Sally S. v. Berryhill*, No. 2:18cv460, 2019 WL 3335033, at *11 (N.D. Ind. July 23, 2019))).

"The Seventh Circuit [Court of Appeals] has not affirmatively established the threshold for

6

the number of jobs in the national economy that qualifies as significant." *John C. v. Saul*, No. 4:19-cv-04111-SLD-JEH, 2021 WL 794780, at *5 (C.D. Ill. Mar. 2, 2021). In *Weatherbee v. Astrue*, the Seventh Circuit found that 140,000 representative jobs in the national economy was "well above the threshold for significance," yet did not definitively identify an actual threshold. 649 F.3d 565, 572 (7th Cir. 2011); *see also Angela L. v. Saul*, No. 1:20-cv-00481-SEB-DML, 2021 WL 2843207, at *5 (S.D. Ind. July 7, 2021); *John C.*, 2021 WL 794780, at *5. In *Primm v. Saul*, the Seventh Circuit found that 110,000 jobs in the national economy was a significant number. 789 F. App'x 539, 546 (7th Cir. 2019). But the *Primm* court relied on *Liskowitz*, a case involving regional, rather than national, numbers.[4] *Primm*, 789 F. App'x at 546; *see Liskowitz*, 559 F.3d at 743 (finding that 4,000 jobs in the Milwaukee area was a significant number, and commenting that "it appears to be well-established that 1,000 jobs is a significant number" (collecting cases)).

"Further, district courts within the circuit—applying national numbers—have found as many as 120,350 jobs to not meet the burden, and as few as 17,700 jobs to be significant." *Angela L.*, 2021 WL 2843207, at *5 (citing *John C.*, 2021 WL 794780, at *5); *compare Sally S.*, 2019 WL 3335033, at *11 (120,350 jobs nationally is not a significant number), *with Dorothy B. v. Berryhill*, No. 18 CV 50017, 2019 WL 2325998, at *7 (N.D. Ill. May 31, 2019) (17,700 jobs nationally is a significant number). Thus, this circuit lacks clear guidance on what constitutes a "significant number" of jobs in the national economy. *See Sundsmo v. Saul*, No. 20-cv-100-

---

[4] At least one judge in this judicial circuit has indicated that "reliance on *Liskowitz*'s regional threshold is . . . suspect (and, by extension, so is the reliance on *Primm*)" when considering a claimant's argument challenging the number of national jobs identified. *James A. v. Saul*, 471 F. Supp. 3d 856, 859-860 (N.D. Ind. July 10, 2020). Therefore, while *Primm* provides some guidance, it is not without its vulnerabilities.

7

wmc, 2020 WL 6817112, at *7 (W.D. Wis. Nov. 20, 2020) (concluding 67,327 jobs nationally was a significant number, observing that "this court has no ready guidance, other than to note that the ALJ's reliance of evidence of jobs in the national economy in the tens of thousands to find the claimant capable of full-time work appears consistent with decades of case law and the applicable regulations . . . ."); *see also Ellis v Kijakazi*, No. 20-CV-719, 2021 WL 3514701, at *5 (E.D. Wis. Aug. 9, 2021) (observing the "lack of clarity from the Seventh Circuit regarding . . . 'significant numbers'" when concluding that 14,500 nationally was not a significant number).

The undersigned Magistrate Judge faced a similar argument earlier this year in *Knapp v. Saul*, No. 1:20-cv-00011-PPS-SLC, 2021 WL 536121, at *4-5 (N.D. Ind. Jan. 27, 2021), *R. & R. adopted by* 2021 WL 536483 (N.D. Ind. Feb. 12, 2021). There, I rejected the claimant's argument that 120,000 jobs nationally was not a significant number. *Id.* In doing so, I commented that "even when considering just the three jobs identified by the VE, the ALJ provided a sufficient number of jobs through his identification of 29,000 polishing machine operator jobs, 22,000 sorting machine operator jobs, and 16,500 wire insulator jobs." *Id.* at *4. Thus, at least in the facts presented in *Knapp* and under the law at the time, I viewed that even 67,500 jobs in the national economy would be a significant number of jobs. *Id.*; *see also Sundsmo*, 2020 WL 6817112, at *7 (finding that 67,327 jobs nationally was a significant number); *Angela L.*, 2021 WL 2843207, at *6 (finding that 53,200 jobs nationally was a significant number). Neither party here has presented me with a persuasive reason to depart from that viewpoint now. Therefore, given my prior Opinion and Order in *Knapp*, and the lack of clarity in the circuit on the issue, I conclude that 99,000 jobs is a "significant number" of jobs for purposes of the ALJ's step-five determination in this case. *See Marko L. v. Saul*, No. 16 C

9723, 2021 WL 843427, at *7 (N.D. Ill. Mar. 5, 2021) (finding that 99,000 jobs nationally is a significant number of jobs in the national economy).

2. The VE's Methodology

Dugan also contends that the ALJ's step-five determination lacks the support of substantial evidence because the VE's methodology in arriving at the number of jobs was unreliable. (ECF 24 at 14-17). As already explained, the Commissioner may carry her step-five burden through the use of vocational expert testimony, provided that such testimony is reliable. *See Chavez v. Berryhill*, 895 F.3d 962, 968 (7th Cir. 2018) ("[T]he substantial evidence standard requires the ALJ to ensure that the approximation [by the VE] is the product of a reliable method."); *Liskowitz*, 559 F.3d at 743; *Ehrhart*, 969 F.2d at 540. "Evidence is not 'substantial' if vital testimony has been conjured out of whole cloth." *Donahue v. Barnhart*, 279 F.3d 441, 446 (7th Cir. 2002) (citations omitted). Yet, "[e]stablishing the reliability of a job-number estimate does not require meeting an overly exacting standard." *Chavez*, 895 F.3d at 968. "A VE's estimate will be just that—an estimate." *Id.* "[T]he threshold for such evidentiary sufficiency is not high. Substantial evidence . . . is more than a mere scintilla." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (citations and internal quotation marks omitted).

b. *The VE's Testimony*

At the administrative hearing, the VE testified that a hypothetical individual with Dugan's age, education, work experience, and RFC could perform the representative occupations of sorter, 45,000 jobs nationally; routing clerk, 33,000 jobs nationally; and collator machine operator, 21,000 jobs nationally. (AR 62; *see also* AR 25). After doing so, Dugan's attorney questioned the VE about his methodology in arriving at these numbers:

9

Q All right.  Can you describe your methodology in arriving at your . . . national numbers?

A Sure.  Well, I take a regional sampling of jobs, specifically the ones I would cite, and come up with a number regionally in trying to project, based on population and the Bureau of Labor Statistics and depending on the SOC code, how many people would be - - or how many titles are in the SOC code, and come up with my best projection of the national numbers.

Q All right.  What is the parameter - - geographical parameters of your region?

A Typically, it will be from Chicago down somewhere in central Illinois.

Q Okay.  I mean, do those include specific . . . . Bureau of Labor statistics economic regions?

A They've got them somewhere in Oasis.  I . . . .  don't have that in front of me.  So I couldn't answer that.

Q Okay.  What is Oasis?

A Oasis is a program that I use, from time to time, to help me sort out certain restrictions in jobs.  It's very comprehensive.  It will use SOC, then . . . . other publications.

Q Did you use Oasis in . . . putting together the numbers for the step five jobs you identified today?

A No.

Q All right.  Other than population, what other characteristics of the region that you used make it a good sample . . . for projecting national numbers?

A Right.  Well, population is a very important part of that.  Chicago is what I used, and I . . . find it a fairly good example of the cross section of America.

Q Chicago itself?

A Chicago and the suburbs.

Q Okay. . . .  So what's the math?  What is . . . the proportion of the

> population of this regional sample to the entire country?
>
> A  Right.  Well, what I do is take, say, for instance, housekeepers, . . . and I would call anywhere from 10 to 30 housekeeping agencies, get a general number . . . and . . . try to project from there how many hotels and motels that would be in that region, which is easier to count than the entire U.S. Then I come up with that number, and I try to match it with various populations under density  - - Fort Wayne [is] obviously not as big as Chicago, for instance.  And Indiana has less population than Illinois.  So, of course, those numbers would be adjusted accordingly.
> And again, I'm not a statistician.  So . . . I try to project the best . . . way I can.
>
> Q  But you're not projecting . . . on the basis of any small statistical sampling that has any mathematical relationship to the country as a whole?
>
> A  I wouldn't say that.  You know, I'm using population surveys to come up with - -
>
> Q  But you can't . . . tell me, as we're sitting here, what the math was you used to project the national numbers on these specific jobs?
>
> A  No.
>
> Q  So there's no way I can test whether your numbers are reliable because I can't re-do your math.  Is that a fair statement?
>
> A  You can't re-do my research, correct.
>
> Q  Okay.
>
> ATTY:  Same objection, Your Honor.  There's no way in the world these numbers would qualify as reliable.  And even if they are, there's no way I can cross-examine it, and I certainly have a right to look at the math.  I'm perfectly capable of doing this type of math myself and telling whether or not it's correct or not and certainly know how to cross-examine on it if there is any math to cross-examine on it . . . .  There's none here.  It's not reliable.  So I object.  Thank you, Your Honor.
>
>   ALJ:  Okay.  I will take that under consideration.

(AR 63-67).

*c. Analysis*

Here, Dugan contends that upon his counsel's cross-examination, the VE "was not cogent and thorough," and "gave generalities but could not testify as to how they specifically applied to the Sorter, Routing Clerk, and Collating Machine Operator occupations." (ECF 24 at 16). Thus, Dugan claims that the VE's testimony about the job numbers is not a product of reliable methodology, and consequently, that the ALJ's step-five determination is not supported by substantial evidence.

The ALJ discussed Dugan's objection in her decision, but ultimately overruled it, explaining:

> The claimant's representative objected to these job numbers on the ground that the [VE's] methodology for determining the number of jobs is not reliable. The undersigned overrules this objection. The [VE] has professional knowledge and experience in job placement. The [VE] testified that he conducts his own surveys and takes a regional sampling of jobs that he would cite, and then projects them to national numbers. The Supreme Court case of *Biest[e]k v. Berryhill* found that a [VE's] testimony regarding job numbers is not automatically unreliable if the expert does not produce his or her own market surveys. In this case, the [VE's] background, experience, and testimony about his employment surveys support the reliability of his numbers. Accordingly, the [VE]'s job information is found to be reliable.

(AR 25). Having considered the issue, the Court agrees that the VE's testimony in this instance was sufficiently reliable.

To explain, the VE testified that he arrived at national numbers based on projections from a "regional sampling of jobs" from the Chicago area—that is, the VE conducts his own market surveys—used in conjunction with population surveys and Bureau of Labor Statistics SOC codes. (AR 64). Dugan argues that her counsel could not conduct a meaningful cross examination of the VE without knowing the "mathematical formula" used by the VE to arrive at

the national numbers. (ECF 24 at 14). But Dugan's assertion is unpersuasive. "Though the VE's description did not reveal the precise mechanics and statistical model involved, it nevertheless constitutes a 'reasoned and principled explanation,' at least by the low substantial evidence standard." *Bruno v. Saul*, 817 F. App'x 238, 243 (7th Cir. 2020) (citing *Chavez*, 895 F.3d at 970). "A VE's estimate will be just that—an estimate. . . . The VE necessarily must approximate, and there is no way to avoid uncertainty in doing so." *Chavez*, 895 F.3d at 970.

The Seventh Circuit has recognized that the standards by which an expert's reliability are measured are generally less stringent at an administrative hearing than under the Federal Rules of Evidence. *Donahue*, 279 F.3d at 446. The Seventh Circuit's reasoning in *Liskowitz* is particularly relevant here:

> Perhaps ideally the VE would have been able to say a bit more, but this does not go without saying. The witness was testifying as a vocational expert, not as a census taker or statistician. Indeed, even if the VE had happened to know something about the statistical basis for her testimony, she arguably still would not be in a position to fully vindicate her conclusions. After all, statisticians use arithmetic operations, but few probably have studied the foundations of arithmetic in set theory. Is the statistician's use of arithmetic therefore unjustified? Clearly not. In administrative proceedings, no less than in ordinary life, "explanations come to an end somewhere."

559 F.3d at 743-44 (citation omitted).

Furthermore, this is not a case in which the claimant made a demand for the VE's underlying sources and data. Rather, while Dugan's counsel questioned the VE about his methodology, he never actually asked the VE to produce his underlying data and sources. (*See* AR 63-67). And even if Dugan's counsel had made such a request, "vocational experts are not categorically required to provide their underlying data." *Krell v. Saul*, 931 F.3d 582, 587 (7th Cir. 2019) (citing *Biestek*, 139 S. Ct. at 1157). "The expert may decline to do so, and if he does,

this failure goes to the weight the ALJ may give the testimony." *Id.* "Considering the totality of his testimony, the expert can be deemed credible even if he provides no underlying data. The ALJ makes such determinations on a case-by-case basis."[5] *Id.* (citing *Biestek*, 139 S. Ct. at 1157). Nor did Dugan supplement the record after the hearing with a post-hearing brief or contrary numbers, sources, or methodology. *See Britton v. Astrue*, 521 F.3d 799, 804 (7th Cir. 2008) (suggesting various methods that a claimant may use to challenge a VE's testimony).

Therefore, having considered the record presented, the ALJ's step-five determination about the number of representative jobs is supported by substantial evidence—namely, the testimony of the VE that was a product of reliable methodology. Consequently, the Commissioner's final decision will be affirmed.

## IV.  CONCLUSION

For the foregoing reasons, the Commissioner's decision is AFFIRMED. The Clerk is DIRECTED to enter a judgment in favor of the Commissioner and against Dugan.

SO ORDERED.

Entered this 9th day of November 2021.

/s/ Susan Collins  
Susan Collins  
United States Magistrate Judge

---

[5] At the same time, the Seventh Circuit advised that "[i]t is certainly best practice for vocational experts to provide underlying sources at hearings, and we encourage them to do so." *Id.* (citations omitted).